## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ANDREW FIRSTMAN, MARK HORNCASTLE, and CHRISTIAN CRAM,

                        Petitioners,

       -v-

CREDIT SUISSE SECURITIES (USA) LLC,


                        Respondent.

:
:
:
:
:
:
:
:
:
:
:
:

**Case No. <u>1:19-cv-04025-CAP</u>**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## BRIEF IN OPPOSITION TO PETITION TO CONFIRM AND IN SUPPORT OF APPLICATION BY MOTION TO VACATE ARBITRATION AWARD

Leah Ward Sears
Georgia Bar No. 633750
Colin Đặng Delaney
Georgia Bar No. 216858
Gregory K. Smith
Georgia Bar No. 658363
Sasha N. Greenberg
Georgia Bar No. 497615
SMITH, GAMBRELL & RUSSELL, LLP
Promenade, Suite 3100
1230 Peachtree Street, NE
Atlanta, Georgia 30309-3592
Telephone: 404-815-3500
Facsimile: 404-815-3509
Email: lsears@sgrlaw.com
Email: cdelaney@sgrlaw.com
Email: gsmith@sgrlaw.com
Email: sgreenberg@sgrlaw.com
*Counsel for Respondent Credit Suisse Securities (USA) LLC*

### ***TABLE OF CONTENTS***

INTRODUCTION ................................................................. 1

FACTUAL BACKGROUND ................................................. 3

  I.     Petitioners' employment with Credit Suisse ........................... 3

  II.  Petitioners seek other employment in reaction to rumors .......................... 4

  III.  The fatally flawed Arbitration................................... 6

ARGUMENT....................................................................... 9

  I.    The Award Should Be Vacated Because the Chairperson Was Biased, Violated Her Duty to Disclose, and the Panel Exceeded its Authority ...... 9

  II.   The Award Should Be Vacated Because Black was Biased and Violated Her Obligation to Disclose ...................................................11

   A. The Award Should Be Vacated Because Black Was Biased ......................13

   B. The Award Should Be Vacated Because Black Failed to Disclose the Writings that Reveal Her Bias ..................................................15

  III.  The Award Should be Vacated Because the Panel Exceeded its Authority and Manifestly Disregarded the Law .....................................................18

   A. The Panel Exceeded its Authority and Manifestly Disregarded the Law by Awarding Damages for Deferred Contingent Awards ..............................20

        1.    The Panel Ignored Black Letter Law Defining Termination of Employment ……………………………….............................20

        2.    The Arbitrators Ignored Black Letter Law Which Forbids Recover in the Absence of an Injury ………………....……….24

   B. The Panel Exceeded its Authority and Manifestly Disregarded the Law By Awarding Damages in Excess of those Authorized by Law......................26

i

C. The Panel Exceeded its Authority By Awarding Interest as of October 20, 2015. ........................................................................................................29

D. The Panel Exceeded Its Authority By Awarding Attorney's Fees ............29

CONCLUSION ……………………………………………………………..30

RESPONDENT Credit Suisse Securities (USA) LLC ("Credit Suisse") submits this Brief in Opposition to Petition to Confirm and in Support of Application by Motion to Vacate Arbitration Award, pursuant to the Georgia Arbitration Code ("GAC"), O.C.G.A. § 9-9-13, and the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10(a), showing the Court the following:

## *INTRODUCTION*

This case concerns a fatally flawed Arbitration Award ("the Award") rendered by a Panel of the Financial Industry Regulatory Authority ("FINRA") Office of Dispute Resolution.  The Award was produced by a biased Chairperson and a Panel that ignored the arbitration agreement from which it drew its authority.

The underlying arbitration involved a contract dispute that turned entirely on issues of contract interpretation. Petitioners, who resigned from Credit Suisse by letter dated  November 20, 2015, and started working with JP Morgan that same day, sought to recover unvested contingent deferred awards ("contingent awards"), which were automatically canceled when they resigned.   Petitioners' new employer, JP Morgan, agreed, in writing, to replace the contingent awards to induce them to resign, leaving them without damages.

The parties agreed that New York law governed the Plan Documents. CS Pre-Hearing Br. at 22-23; SOC at 11; Ex. 1-A, at 7.  The parties also agreed that the

1

choice of law clause in the Credit Suisse Employee Dispute Resolution Program ("EDRP") required the Panel to apply New York law to the parties' dispute; however, Petitioners asked the arbitrators to ignore controlling law and to resolve their claims under Georgia statues and their personal notions of equity.

The face of the Award shows that the Panel, led by a biased Chairperson,[1] ignored the choice of law clause and, thus, the substantive limitation on its authority. Indeed, the Panel awarded attorney's fees and interests *pursuant to Georgia statutes* and ignored several clear principles of law, including: (1) the definition of a "termination"; (2) the prohibition against awarding contract damages in the absence of an injury; (3) the prohibition against an equitable recovery where there is a written contract; and (4) the requirement to calculate damages for breach of the obligation to deliver stock using the stock price on the contractual delivery date. As a result, Credit Suisse did not get a fair hearing, but Petitioners got a windfall of $1.7 million for canceled contingent awards, which had already been replaced.

Even under the lenient standards of review for arbitration awards, the Award here must be vacated for several reasons. First, the Chairperson was biased against Credit Suisse and violated her obligation to disclose writings which reflect her clear

---

[1] The composition of the Panel also changed at the very end of the arbitration, one lawyer arbitrator was replaced with a non-lawyer arbitrator who appeared on the fourteenth day of a sixteen day hearing.

2

and concrete bias.  Second, the Panel exceeded its authority by awarding damages, attorneys' fees, and interest in manifest disregard of the law it was bound to apply.

## *FACTUAL BACKGROUND*

### I.   Petitioners' employment with Credit Suisse

Petitioners Andrew Firstman, Mark Horncastle, and Christian Cram were employed as Relationship Managers ("RMs") in Credit Suisse's Atlanta office, where they worked as a team selling investments to ultra-high net worth clients, until they resigned by letter on November 20, 2015.  JX 38.  Like many financial institutions, Credit Suisse had a deferred-compensation program designed to incentivize RMs to remain employed by Credit Suisse and to align their interests with those of the firm and its shareholders. JX 22, at 8; 24 at 1; 84 at 3.  Under that program, highly compensated RMs were eligible to receive contingent awards, which were governed by written award certificates under the Credit Suisse Master Share Plan (collectively, "the Plan Documents"). SOC at 11, JX 22, at 8.  The award certificates set forth the "conditions of vesting, delivery, and settlement" and explained that awards would vest on specified future dates ("vesting dates"), *provided that the recipient remained employed by Credit Suisse on those dates*.  JX 22, 46, 47, 77-84, 117-23; Tr. at 3441-43.  Before the settlement date, RMs received only "phantom shares," which could be converted into actual shares *only if* the RM

3

fulfilled all contractual conditions to vesting and settlement.  Tr. at 3443-45.  The award certificates plainly stated that "any unvested Share Awards shall be canceled immediately" if the recipient resigned before the vesting date. JX 46, 47, 77-84, 117-23 at ¶ 4.a.

The contingent awards at issue were scheduled to vest after the Petitioners' resignation, between January 2016 and January 2020, and to settle (*i.e.*, be transferred to the Petitioners' account) between May 2016 and October 2019.  RX. 1175A-1177A; Tr. at 3473 (Tocknell); Tr. at 3694-3710 (Dubinsky).  Petitioners were well aware that these awards would be canceled if they resigned before the vesting dates. Tr. at 911-12 (Firstman); 1041-42 (Horncastle); 1937-38 (Cram).

## II.    Petitioners seek other employment in reaction to rumors

In July 2015, a new CEO took the helm of Credit Suisse's corporate parent, which prompted rumors that Credit Suisse's U.S. wealth management business might be sold.  SOC at 5-6.  Petitioners responded by seeking other employment. *Id.* at 9-10.  While Petitioners knew that their unvested contingent deferred awards would be canceled upon their resignation, they also knew that a prospective employer would replace those awards consistent with "industry standard, normal practice."  Tr. at 1120-21, 1675 (Horncastle); *see also* Tr. at 1544-45 (Vasan); Tr. at 3302-04 (Tocknell).

On October 20, 2015, Credit Suisse announced that it had entered a Broker Referral Agreement with Wells Fargo, which contemplated the transition of Credit Suisse's United States private banking division to Wells Fargo.  SOC at 11, JX 1. Senior management asked all employees to assist with the transition, which would take months, explaining that they would need "all hands on deck" "through the end of the year and continuing into the first quarter [of 2016] to run and effectively transition this business."  *Id*. at 5.  They also stated that every RM would receive an employment offer from Wells Fargo and that the process of transitioning RMs and clients to Wells Fargo "will go into Q1 of 2016." *Id*. at 5.

On the day of the announcement, Petitioner Firstman contacted the branch manager of JP Morgan's Atlanta office to discuss employment.  Tr. at 770-80; RX 803.  JP Morgan requested, and Petitioners furnished, documents concerning the value of their contingent awards.  RX 831, 832, 836, 1081, 1142.  In accordance with industry standards, JP Morgan's initial offers to Firstman and Horncastle *expressly agreed to replace those awards*:

> **We understand that upon joining JP Morgan Chase, you will forfeit compensation**, which may include both cash and equity awards, *from Credit Suisse,* that **you have estimated to have a current value vested of [certain amounts]. You will be granted, as of your Hire Date, JPMorgan Chase & Co. Restricted Stock Units as the replacement for this forfeited compensation**, provided that you did not forfeit the compensation due to a violation of any obligation to Credit Suisse.

JX 103, at ¶5 (emphasis added); RX 896, at ¶5; JX 64, 105, 164.

On the advice of their colleague David Greene – and with the assistance of common counsel – Petitioners set out to camouflage the "make whole" provisions in their offer letters. They asked JP Morgan to call the payments "special payments," and eliminate reference to Credit Suisse in their agreements. CX 260, 261; RX 842, 907. According to Greene, this wordsmithing would "leave the door [open] to sue CS." RX 842. While JP Morgan agreed to eliminate all references to Credit Suisse and to replace the words "**Replacement of Deferred Compensation**" with "**Special Payment**" in Petitioners' offer letters, *Compare* JX 103 *with* JX 108; RX 897 *with* JX 142, it still referred to those payments as the replacement of deferred compensation internally and required Petitioners to provide proof of the value of their awards, which they did. RX 1095, 1098, 1155.

With the replacement of deferred compensation duly camouflaged, Petitioners submitted a resignation letter, drafted by their counsel, to Credit Suisse on November 20, 2015, which stated that "[a]fter much consideration, [they had] decided to join JP Morgan Securities, effective immediately." RX 944; Tr. at 1740. Petitioners began working at JP Morgan that same day. Tr. at 492, 1746.

## III. The fatally flawed Arbitration

As Credit Suisse employees, Petitioners agreed to resolve disputes according

to the Credit Suisse EDRP, SOC at 3, which required that all disputes were governed by New York law and would be arbitrated at JAMS or the American Arbitration Association ("AAA"). SOC Ex. 1-A, at 40-41.  After the Second Circuit rejected challenges to the EDRP in an unrelated case, *see Credit Suisse v. Tracey,* 812 F.3d 249, 254-56 (2d Cir. 2016), Petitioners asked  FINRA to sanction Credit Suisse if it sought arbitration at JAMS or AAA as required by the EDRP.  SOC at 3-4; Ex. 1.

Once FINRA threatened sanctions, SOC Ex. 2, Petitioners filed a Statement of Claim at FINRA,  among other things, alleging that the EDRP violated FINRA rules, and criticizing the EDRP because it prescribed arbitration at either JAMS or AAA. SOC at 4. Petitioners sought to recover contingent awards, which they admitted were controlled by the Plan Documents.  SOC. at 11.

In accordance with FINRA Rule 13404, FINRA sent a list of potential arbitrators, with disclosures, so that counsel could strike and rank them. Unbeknownst to Credit Suisse, Chairperson Barbara Black violated Rule 13408(a), by failing to disclose writings, which evinced a clear bias against broker-dealers like Credit Suisse, and a particularly acute bias against any broker-dealer that attempted to exercise its rights under the FAA to tailor the rules under which it would arbitrate. Thus, Credit Suisse was deprived of its right to a hearing before impartial arbitrators.

During closing arguments, Petitioners repeatedly castigated Credit Suisse for

lawfully exercising its rights under the FAA. Tr. at 3962-64. Petitioners also continually asked the Panel to disregard controlling New York law.  Tr. at 3955-66. Specifically, Petitioners asked the Panel to find that they were terminated on October 20, 2015, even though under controlling law, they could not have been terminated on that date because they continued to work at and be paid by Credit Suisse until they resigned on November 20, 2015.  Tr. at 3894; Damages Statement.  Likewise, they sought recovery of the contingent awards, on the equitable theories of *quantum meruit*, unjust enrichment, and equitable estoppel, Tr. at 3955-61, even though controlling law forbids equitable remedies in the face of an express contract governing the subject.  Petitioners' Closing PowerPoint at 107.  They also asked the Panel to value the contingent awards using the share price on October 20, 2015 (the date of the Wells Fargo announcement), and to award interest from that date forward, based on "equitable principles" even though they admitted that the awards would not have settled until 2016, 2017, 2018, 2019, and 2020 under the Plan Documents. Tr. at 4012-15; Damages Statement.  Finally, Petitioners asked for interest and attorney's fees under Georgia statutes.  Tr. at 4011, 4014-15; Damages Statement.

Although the parties repeatedly informed the arbitrators that the dispute was controlled by New York law, the Panel ignored it. CS Pre-Hearing Br. at 22-23; SOC at 11; Ex. 1-A, at 7; Tr. at 3956-57, 3635, 4160-63.  On September 6, 2019, the Panel

issued an award ordering Credit Suisse to pay $1,010,000.00 to Firstman, $660,000 to Horncastle, and $85,000 to Cram, and expressly awarding interest under Georgia statutes, "starting on October 20, 2015," F-01208 (citing O.C.G.A. §§ 7-4-2 and 13-6-13). Finally, although Petitioners admitted they were not entitled to attorney's fees under New York law, Tr. 41014-15, the arbitrators ordered Credit Suisse to pay attorney's fees of $719,000, pursuant to O.C.G.A. § 13-6-11. F-01208.

## *ARGUMENT*

### I.   **The Award Should Be Vacated Because the Chairperson Was Biased, Violated Her Duty to Disclose, and the Panel Exceeded its Authority**

Credit Suisse bears the burden of establishing that the Award should be vacated. *Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*, 559 U.S. 662, 671 (2010); *CareMinders Home Care, Inc. v. Kianka*, 666 Fed. Appx. 832, 834 (11th Cir. 2016). Because the Chairperson was biased and violated her duty to disclose and because the Panel exceeded its authority, Credit Suisse meets that burden here. [2]

---

[2] The GAC, which closely tracks the FAA, provides that an award "shall be vacated on the application of a party . . . if the court finds that the rights of that party were prejudiced by" one of five grounds including, "partiality of an arbitrator appointed as a neutral," "an overstepping by the arbitrators of their authority or such imperfect execution of it that a final definite award upon the subject matter submitted was not made" or "the arbitrator's manifest disregard of the law." O.C.G.A. § 9-9-13(b)(2), (3), & (5). Because the parties' arbitration agreement contained a New York choice of law clause, this Court should also review the Award under New York law. *See Original Appalachian Art v. Jakks Pac., Ind.*, 718 Fed. Appx. 776, 780-81, 781 n.3 (11th Cir. 2017) (applying Georgia law); *Credit Suisse Securities (USA) LLC v. CRL*

First, the Court should vacate the award because Black was biased and she engaged in misconduct by failing to disclose the writings that demonstrate her bias. 9 U.S.C. §§ 10(a)(2); 10(a)(3).  When reviewing allegations of arbitrator bias, a court should hold an evidentiary hearing. *Univ. Commons-Urbana, Ltd. v. Univ. Constructors, Inc.,* 304 F.3d 1331, 1341-42 (11th Cir. 2002).[3]

In addition, the Court should vacate the award because the arbitrators exceeded their authority and manifestly disregarded the law.[4]  9 U.S.C. § 10(a)(4).

---

*Mgm't., LLC,* 2014 WL 12862213, at *4 (SD Fla. Sept. 28, 2014) (applying New York law).  New York courts review arbitration awards resolving interstate commerce under the FAA. *Diamond Waterproofing Systems, Inc. v. 55 Liberty Owners Corp.,* 4 N.Y.3d 247, 252 (2005); *Salvano v. Merrill Lynch, Pierce, Fenner & Smith,* 85 N.Y.2d. 173, 180 (1995).

[3] Credit Suisse reserves the right to supplement the materials which Chairperson Black failed to disclose and which evidence her bias at any hearing.

[4] The manifest disregard standard is expressly included in the GAC.  O.C.G.A. § 9-9-13(b)(5). The Supreme Court has recognized the overlap between Section 10(a)(4) of the FAA and the doctrine of manifest disregard of the law, but declined to decide whether manifest disregard survived "as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur.  559 U.S. at 671 n.3.  Although the Eleventh Circuit does not recognize manifest disregard as grounds for vacatur under the FAA, it has reviewed arbitration awards for manifest disregard when the parties' arbitration agreement contained a choice of law provision that required the application of law from a jurisdiction that recognizes the doctrine.  *See Original Appalachian Art v. Jakks Pac., Ind.*, 718 Fed. Appx. 776, 780-81, 781 n.3 (11th Cir. 2017) (reviewing an arbitration award for manifest disregard because the parties' agreement had a Georgia choice of law clause and Georgia recognizes manifest disregard of the law). New York law provides for review of arbitration awards for manifest disregard of the law.  *See, e.g.*, *Weiss v. Sallie Mae*, 939 F.3d 105 (2d Cir. 2019); *Wein & Malkin LLP v. Helmsley-Spear, Inc.*, 6 N.Y.3d 471, 479-81 (2006).

Arbitrators are required "to *identify the rule of law governing the situation*," and use it to resolve any dispute. *Stolt-Nielsen,* 559 U.S. at 673 (emphasis added). When arbitrators ignore the "rule of decision" identified in the arbitration agreement, and instead, "impose[] their own policy choice," they "exceed[] [their] powers." *Stolt-Nielsen,* 559 U.S. at 677; *accord Wiregrass Met. Trade Council v. Shaw Envtl. & Infr., Inc.,* 837 F.3d 1083, 1088 (11th Cir. 2016). Here, the arbitrators violated the arbitration agreement that empowered them by refusing to follow New York law. The arbitration agreement in the EDRP expressly required the arbitrators to resolve this dispute under "the laws of the State of New York, without regard for the conflicts of laws." JX 14, at 51 ¶ 5. The Plan Documents dictate that they are governed by New York law. JX 24, at ¶15(h); JX 46, at ¶ 9(m). However, at Petitioners' request, the arbitrators granted relief under Georgia statutes and their own personal notions of equity. Since "they fail[ed] to comply with mutually agreed upon contractual provisions in an agreement to arbitrate," the arbitrators "exceed[ed] their power . . ." *Cat Charter LLC v. Schurtenberger,* 646 F.3d 836, 843 (11th Cir. 2011). For this further reason, the Award must be vacated. *See id.*; *accord Stolt-Nielsen*, 559 U.S. at 671-76, 681-84; *Wiregrass,* 837 F.3d at 1088.

## II.   The Award Should Be Vacated Because Black was Biased and Violated Her Obligation to Disclose

The Court should vacate the award because Chairperson Black was biased

11

against Credit Suisse, and concealed her bias by violating her obligation under FINRA Rule 13408(a) to disclose the writings that demonstrated her bias. Courts must scrupulously "safeguard the impartiality of arbitrators . . . since [they] have completely free rein to decide the law, as well as the facts and [their decisions], are not subject to [traditional] appellate review." *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145,149 (1968), *accord Univ. Commons,* 304 F.3d at 1338. "To maintain this sense of impartiality, the law imposes the simple requirement that arbitrators disclose to the parties any dealing that might create an impression of possible bias." *Univ. Commons,* 304 F.3d at 1338 (citations omitted).

Disclosure is fundamental to a fair arbitration and "the Supreme Court has  . . .clearly endorsed the judicial enforcement of an arbitrator's duty to disclose." *Monster Energy v. City Beverage,* 940 F.3d 1130, 1138 (9th Cir. 2019); *accord Univ. Commons*, 304 F.3d. at 1338. (holding that "courts should, if anything, be even more scrupulous to safeguard the impartiality of arbitrators than judges"). When arbitrators violate their disclosure obligations, it creates a presumption that the arbitrator was biased. *See id.* at 1341; *Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, S.A.,* 492 F.3d 132, 137 (2d Cir. 2007). An award may be vacated due to evident arbitrator partiality when "(1) an actual conflict exists, **or** (2) the arbitrator knows of, but fails to disclose, information which would lead a

reasonable person to believe that a potential conflict exists." *Johnson v. Directory Assistants, Inc.*, 797 F.3d 1294, 1300 (11th Cir. 2015) (emphasis added) (citing *Univ. Commons,* 304 F.3d at 1338).   Black was both biased and failed to disclose information demonstrating her bias.

### A.    The Award Should Be Vacated Because Black Was Biased

A court may vacate an award due to "evident partiality" when "a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Barclays Capital v. Platt,* 2018 U.S. Dist. LEXIS 216879, at *7 (S.D. Fl. 2018) *aff'd*, No. 19-10189, 2019 WL 4509283 (11th Cir. 2019).   Here, any "reasonable person" would conclude that Black's writings demonstrate a "direct, definite" bias against Credit Suisse.  *Univ. Commons*, 304 F.3d. at 1339.

The very title of one of Black's articles, *The Irony of Securities Arbitration Today: Why Do Brokerage Firms Need Judicial Protection?,* 72 U. Cin. L. Rev. 415 (2003), evidences Black's hostile view that brokerage firms, like Credit Suisse, are *not even entitled to judicial protection*.   In this article, Black opines that "*[b]rokerage firms have no right to expect judicial protection* from arbitration," and during arbitration hearings, "*the focus should be on whether the process is fair to the investors, not brokerage firms*." *Id*. at 428, 445 (emphasis added).  Black concludes that FINRA arbitration is a good forum for parties *adverse* to broker-dealers because

13

"arbitrators are not bound strictly to follow the law, which may impose significant obstacles to recover." *Id*. at 445.

In another article, *Making It Up As They Go Along: The Role of Law in Securities Arbitration,* 23 CARDOZO L. Rev. 991 (2002), Black lauded FINRA arbitration because parties *adverse* to brokerage firms fare well "where less attention is paid to the law and more to the equities of the dispute before the arbitration panel." *Id.* at 995. In direct contravention of *Stolt-Nielsen,* the FINRA Arbitrator Manual,[5] and the choice of law clause in the EDRP's arbitration agreement, Black also observed that arbitration favors parties adverse to brokerage firms because "arbitrators are **not** bound by the law," and "may do justice as [they] see [] it," and render awards "reflecting the spirit *rather than the letter of the agreement to arbitrate*." *Id.* at 997 (boldface in the original; italic added.

In Black's view, FINRA arbitrators are free to eschew "outdated legal doctrine" in favor of their own "individualized notions of fairness." *Id.* at 1047. That freedom to ignore the law, Black posited, "create[s] opportunities – albeit unpredictable ones – for recovery of customer losses where none existed before."

---

[5]  The FINRA Arbitrator Manual explains that "arbitrators may not manifestly disregard the law," and if they do so, the "award may be vacated."  It further instructs arbitrators that:  "if the parties have provided the panel with the law, the law is clear, and it applies to the facts of the case, the arbitrators should not disregard it.  *Id. at* 64.

*Id.* at 1047.  In short, Black has opined that brokerage firms are not entitled to impartial hearings or awards that reflect their arbitration agreements.

The most compelling evidence of Black's bias against brokerage firms is a 2013 amicus brief that she submitted in *Department of Enforcement v. Charles Schwab & Co., Inc.* (FINRA No. 2011029760201), which urged FINRA to *sanction* a broker-dealer for exercising its right under the FAA to include class action waivers in the pre-dispute arbitration agreements.  Amicus Br., Ex. A, at 2, 9.  Black did not submit the brief on behalf of any client or receive payment for it.  Amicus Br. at 1 n.1.  It thus reflects *Black's personal – and erroneous – view* that brokerage firms should *be disciplined* for exercising their well-recognized right *"to structure their [arbitration] agreements"* as they see fit.  *See Stolt-Nielsen*, 559 U.S. at 681-83.

In sum, Black's undisclosed writings demonstrate a "definite and direct" bias against brokerage firms generally and a particular bias against firms like Credit Suisse, who exercised their right under the FAA to tailor arbitration agreements to their specific needs.  Black's bias deprived Credit Suisse of its right to an impartial hearing and this alone requires vacatur of the arbitration award.  FINRA Rule 13408(c); FINRA Arb. Guide at 7; *Univ. Commons,* 304 F.3d at 1339.

**B.  The Award Should Be Vacated Because Black Failed to Disclose the Writings that Reveal Her Bias**

"Arbitrator disclosure is the cornerstone of FINRA arbitration."  Arbitrator

Guide at 17.  It is well-settled that "for the arbitration process to work successfully, the onus must be placed on the arbitrator to reveal potential bias."  *Middlesex Mut. Ins. Co. v. Levine*, 675 F.2d 1197, 1204 (11th Cir. 1982); *Commonwealth Coatings*, 393 U.S. at 149; FINRA Arb. Guide at 17.   To vacate an award based on an arbitrator's failure to disclose, "(1) the arbitrator must be aware of the facts comprising a potential conflict; (2) the potential conflict must be one that a reasonable person would recognize; and (3) the arbitrator must fail to disclose the conflict." *Univ. Commons*, 304 F.3d at 1341.  Under this standard, the Award should be vacated.First, Black was obviously aware of her writings.  Second, as explained above, any reasonable person reviewing these writings would conclude that Black is biased against brokerage firms like Credit Suisse.  Finally, Black, a retired law professor, who served as the Chairperson of the FINRA Arbitration Task Force, did not disclose her writings, despite her clear and continuing obligation to do so.

FINRA, like all arbitral fora, has explicit disclosure rules.  FINRA Rule 13408(a) requires arbitrators to disclose "any circumstances which might preclude the arbitrator from rendering an objective and impartial determination."  The FINRA Arbitrator Guide explains that "disclosure is the cornerstone of FINRA arbitration" and that the duty to disclose "is continuous and imperative." Arbitrator Guide at 17. It directs arbitrators to disclose "any publications, lawsuits or other information that

16

"may affect—or even appear to affect—the arbitrator's ability to be impartial *and the parties' belief that the arbitrator will be able to render a fair decision*."   *Id.* (emphasis added).   In addition, FINRA requires all arbitrators to swear an Oath to disclose whether they have any *opinions about the subject matter of the dispute* or have *participated in disputes with similar issues*.   Arbitrator Oath at Q.VIII.1; F-00210; Q.III.4 F-00203.   Rather than disclose the troubling articles and amicus brief as required by the FINRA Rules, Arbitrator Guide, Oath, and relevant case law, Black simply stated that as "a law professor, I have written numerous law review articles on securities arbitration, broker-dealer regulation, and securities fraud."   *Id.* at F-00184.   This vague statement, which did not include the titles or citation to any articles nor *any* mention of the amicus brief, was clearly insufficient.   Black's failure to disclose her writings "with enough specificity" to alert the parties to her bias "constitute[s] *prima facie* grounds for vacatur of the award."   *Univ. Commons*, 304 F.3d at 1341; *accord Applied Indus. Materials,* 492 F.3d at 137.   Credit Suisse did not have a duty to ferret out Black's bias.   Black had a duty to disclose.

Even if Black's failure could be excused as an oversight, which it cannot, multiple events should have prompted her to supplement the incomplete disclosure. Once Black read the Statement of Claim criticizing Credit Suisse's EDRP for providing for arbitration at AAA or JAMS, SOC at 3, Black should have either

17

refused the appointment or disclosed her amicus brief. *See* FINRA Arbitrator Guide at 14 ("[A]n arbitrator should refuse an appointment if the arbitrator has firmly held beliefs about the issue in dispute."); Rule 13408; Arbitrator Oath. Similarly, when Credit Suisse's counsel stated that a court would have decided this case on motions due to settled applicable law, Tr. at 2222, Black should have disclosed her articles. Instead, Black obfuscated again by saying: "I agree, I agree." *Id.* Black's continuing failure to disclose is compelling evidence of bias. *Univ. Commons*, 304 F.3d at 1341; *Applied Indus. Materials.,* 492 F.3d at 137.

Black's failure to properly disclose prejudiced Credit Suisse. Had Black disclosed her writings, Credit Suisse would have stricken her or sought her removal. *See* FINRA Rules 13404; 13410(b). Black's disclosure violations are thus not only prima facie evidence of her bias, *Univ. Commons*, 304 F.3d at 1341, but they also deprived Credit Suisse of its right to a fair and impartial hearing. *Middlesex Mut.*, 675 F.2d at 1204. The Court should vacate the award and order a new arbitration before a new panel of arbitrators.

## III.     The Award Should be Vacated Because the Panel Exceeded its Authority and Manifestly Disregarded the Law

The Court should also vacate the Award because the Panel exceeded its authority when it ignored the New York choice of law clause in the parties' arbitration agreements.

18

Because arbitrators derive their power from the parties' agreement, "courts and arbitrators must 'give effect to the contractual rights and expectations of the parties.'" *Stolt-Nielsen,* 559 U.S. at 682 (citations omitted); *accord JPAY, Inc. v. Kobel*, 904 F.3d 923, 928 (11th Cir. 2018). When arbitrators "fail to comply with mutually agreed upon contractual provisions in an agreement to arbitrate," they "exceed their power within the meaning of §10(a)(4)." *Cat Charter,* 646 F.3d at 843; *Stolt-Nielsen,* 559 U.S. at 673; *Wiregrass,* 837 F.3d at 1088. Likewise, when arbitrators ignore the "rule of decision" identified in the arbitration agreement, and "impose[] their own policy choice," they "exceed[] [their] powers." 559 U.S. at 677. The Panel here ignored both the parties' written agreements and the rule of decision.

The same contracts that empowered the Panel, the EDRP and the Plan Documents, also required it to apply New York law. JX 14, at 51 ¶ 5. JX 24, at ¶15(h); JX 46, at ¶ 9(m). Deriving its authority from the parties' agreement, the Panel was bound to follow New York law. *Stolt-Nielsen,* 559 U.S. at 673, 677; *Cat Charter,* 646 F.3d at 843.

It is clear from the face of the Award that the arbitrators deliberately ignored these contractual limitations on their authority. The Panel expressly awarded interest and fees pursuant to *Georgia statutes*. It ignored clear and governing principles of controlling law by allowing Petitioners to recover on their claim for contingent

deferred awards even though they resigned and were made whole by JP Morgan. Similarly, the Panel ignored controlling law by valuing contingent awards and interest as of October 20, 2015, even though Petitioners had no contractual right to receive the contingent awards on that date. These transgressions warrant vacatur.

### A.    The Panel Exceeded its Authority and Manifestly Disregarded the Law by Awarding Damages for Deferred Contingent Awards

Petitioners' claim for contingent awards was a breach of contract claim. Tr. 3953, SOC at 11. The parties agreed that to recover on this claim, Petitioners needed to establish (1) the existence of a contract; (2) performance by the non-breaching party; (3) a breach of a contract by the adverse party; and (4) an injury resulting from the breach. *Eternity Global Master Fund Ltd. v. Morgan Guar. Tr. Co.,* 375 F.3d 168, 177 (2d Cir. 2004); *see also* Petitioners' Pre-hearing Brief at 11. Because Petitioners could not carry their burden of demonstrating performance or injury, they asked the Panel to ignore these black letter elements of contract law and instead grant them "equitable recovery." Tr. at 3958. The Panel obliged, and hence the award must be vacated.

### 1.    The Panel Ignored Black Letter Law Defining Termination of Employment

Petitioners' right to the contingent awards turned on a simple *legal* question: whether Petitioners' departure from Credit Suisse was a resignation or a

termination? The parties agreed that this was the controlling question because Petitioners were entitled to contingent awards only if Credit Suisse terminated them without cause, but not if they resigned. JX 84, at ¶4.a; Tr. at 3953:1-23l 3949; *see also* Tr. at 3951. The answer to that question is simple. Petitioners' employment with Credit Suisse ended with their November 20, 2015 resignation letter. Nonetheless, Petitioners claimed they were terminated on October 20, 2015, when Credit Suisse announced the Broker Referral Agreement. Tr. at 3943. This argument is defeated by controlling law.

Petitioners were not, as a matter of law, terminated on October 20, 2015. The bright-line test for termination is the "complete severance of the relationship of employer and employee." *Meckes v. Cina,* 75 A.D.2d 470, 474 (4th Dep't. 1980) *aff'd.,* 54 N.Y.2d 894, 896 (1981). Employment termination "does not encompass a situation in which an employer continues to pay its employees full wages and benefits"; instead, it only occurs upon the "permanent cessation of the employment relationship." *Long v. Dunlop Sports Grp. Ams., Inc.*, 506 F.3d 299, 302 (4th Cir. 2007). As Horncastle admitted, and as Petitioners' payroll records established, Petitioners were employed and paid by Credit Suisse until their November 20 resignation. Tr. at 1972-74. The law did not permit the conclusion that Petitioners were terminated on October 20, 2015.

21

Petitioners' resignation on November 20, 2015 was not a termination. "Resignation is ordinarily a voluntary act," and even "in cases where an employee is faced with such unpleasant alternatives," resignations "are nevertheless voluntary because the fact remains that plaintiff had a choice." *People v. Grasso,* 54 A.D.3d 180, 211 (1st Dep't. 2008); *accord Clark v. Chick-fil-A, Inc.*, 214 Ga. App. 758, 759 (1994) ("[O]ne cannot state a claim for wrongful termination when it is undisputed that the employment was terminated incident to resignation . . . even if the employee resigned under pressure."). Here, Petitioners departed after they secured a lucrative offer from JP Morgan.

Petitioners were not constructively discharged during the October 20, 2015 Town Hall. As Credit Suisse informed the Panel, a constructive discharge occurs only when the employer has "deliberately ma[de] an employee's working conditions so intolerable that the employee is forced into a voluntary resignation." *Morris v. Schroder Capital Mgmt. Int'l*, 7 N.Y.3d 616, 621 (2006).[6] The "fact that

---

[6] Credit Suisse informed the arbitrators that this definition is universally accepted. *See, e.g.,* CS's Prehearing Brief at 25-31; CS's Closing PowerPoint at 16-21, 35; CS's Opening, Tr. at 105-09, 132-33; CS's Closing, Tr. at 4044-50, 4060-63. *Hall v. Dougherty Cty. Sch. Sys.*, No. 1:15-cv-189, 2017 WL 3584908, at *16-17 (M.D. Ga. Aug. 17, 2017) ("[T]he possibility that a plaintiff may not remain employed is not itself enough to . . . establish that he was constructively discharged.'"); *Amatuzio v. Gandalf Systems Corp.*, 994 F. Supp. 253, 264 (D.N.J. 1998) (dismissing a constructive discharge claim because it would be improper to conclude that imminent layoffs would "forc[e] all reasonable employee[s] to resign").

[Petitioners] looked for alternative employment for several months before resigning" and began their new job "on the very day" they resigned further precluded finding constructive discharge. *Regis v. Metro. Jewish Geriatric Ctr.*, No. 97-CV-0906, 2000 WL 264336, at *31 (E.D.N.Y. Jan. 11, 2000).[7]

Here, Petitioners admitted that they were employed with Credit Suisse after the October 20, 2015 town hall.  Credit Suisse told all RMs *at that meeting* that they would receive an offer from Wells Fargo and asked them to continue working at Credit Suisse and serving clients as usual during the transition, which would last into the first quarter of 2016. JX 1, 5, 12. Thus, Petitioners were not constructively discharged.  *See e.g., Cirscuolo v. Joseph E. Seagram & Sons, Inc.*, 2003 WL 22415753, at *26 (S.D.N.Y. Oct. 17, 2003) (an employer's efforts to arrange future employment prevents "reasonable fact-finder" from concluding that employee was constructively discharged); *see also Boss v. Advanstar Commc'ns, Inc.*, 911 F. Supp. 109, 112 (S.D.N.Y. 1995) (denying severance because the employee was offered a position with acquiring company). In short, under settled principles of law, Petitioners were not terminated or constructively discharged on October 20, 2015.

---

[7] *Pressley v. City of New York*, No. 11-CV-03234, 2016 WL 1271480, at *13-14 (E.D.N.Y. Mar. 31, 2016) ("[C]onstructive discharge claim failed because Plaintiff remained at the Law Department for months while looking for alternative employment[.]"); *accord Shipley v. Hypercom Corp.*, No. 1:09-CV-0265, 2012 WL 12872905, at *53-54 (N.D. Ga. Feb. 15, 2011).

To the contrary, they continued to work and to collect paychecks until they obtained a lucrative offer from JP Morgan on November 20, 2015, and resigned.

When the Panel awarded Petitioners the value of their canceled contingent deferred awards contrary to these settled principles of law, it exceeded its authority. JX 14, at 51 ¶6. Accordingly, the Award must be vacated.

> ### 2. The Arbitrators Ignored Black Letter Law Which Forbids Recovery in the Absence of an Injury

Petitioners admitted that they were seeking damages for a breach of contract. Tr. at 3949-50, 3953. It is well-settled that "[w]ithout a clear demonstration of damages, there can be no claim for breach of contract." *Milan Music, Inc. v. Emmel Comm'n. Booking Inc.,* 37 A.D.3d 206 (1st Dep't. 2007); *accord Eternity Global Master,* 375 F.3d at 177. It is also axiomatic that "[c]ompensation for damages must not result in the injured party receiving a windfall, but rather should 'reflect the realities of the situation.'" *Cusack v. Am. Def. Sys., Inc.*, 2012 WL 1144192 (N.Y. Sup. Ct. Mar. 27, 2012) (citations omitted). Thus, "[t]he actual damage [for breach on an employment agreement] is measured by the wage that would be payable during the remainder of the term *reduced by the income which the discharged employee has earned, will earn, or could with reasonable diligence earn during the unexpired term.*" *Cornell v. T.V. Dev. Corp.*, 17 N.Y.2d 69, 74 (1966). The award violated these principles because Petitioners suffered no injury.

24

JP Morgan's replacement of Petitioners' contingent awards left them without injury. The amount of the replacement payments was equal to Petitioners' estimate of the value of their contingent awards. *Compare* JX 103 *with* JX 108; RX 897 *with* JX 142. Petitioners request that the JP Morgan decision to change the language of its offer from "Replacement of Deferred Compensation," JX 103; RX 893, to "Special Payment," Tr. at 431; CX 260, 261, does not change the fact that Petitioners have suffered no injury. Without injury, there can be no recovery in contract under the law. Yet that is just what the Panel granted Petitioners – a double-dip.

To avoid the burden of proving an injury (and in tacit recognition of the fact that they suffered no injury), Petitioners asked the Panel to ignore the law and to provide an "equitable remedy." Tr. at 3959. The request for an equitable recovery violated two additional bedrock principles of law, which Credit Suisse explained to the Panel. First, a party cannot recover under equitable theories when an express contract governs the subject matter. CS Closing PowerPoint at 107-14 (citing *Goldman v. Metro Life Ins.,* 5 N.Y.3d 562, 572 (2005); *Clark-Fitzpatrick Inc. v. LIRR,* 70 N.Y.2d 382, 388 (1987)). Second, a party cannot recover on any equitable theory when there is no proof of injury. Tr. at 4144-46; CS's Closing PowerPoint at 141 (citing *Aquino v. Douglas Elliman Realty, LLC*, 155 A.D.3d 472, 473 (1st Dep't 2017)). The Panel was not free to ignore these bedrock legal principles. Indeed,

Courts vacate arbitration awards when the arbitrators "did not merely misapply principles of contractual interpretation . . . but drew upon a concept [of equity] upon which it is not entitled to rely." *Harry Hoffman Printing Inc. v. Graphic Comm'ns Int'l. Union, Local 261,* 950 F.2d 95, 98-99 (2d Cir. 1991). That is just what happened here.

In short, although Petitioners suffered no injury and *admitted that their demand for contingent deferred awards was governed by a written contract*, they demanded an equitable recovery. The Panel, led by a Chairperson who believes arbitrators may ignore the law, issued an award that contravened the law by compensating Petitioners a second time for the contingent awards that JP Morgan had already replaced. The Panel thus exceeded its authority, and the Award should be vacated under Section 10(a)(4) of the FAA. *Stolt-Nielsen,* 559 U.S. at 673, 677.

### B. The Panel Exceeded its Authority and Manifestly Disregarded the Law by Awarding Damages in Excess of those Authorized by Law

It is black letter law that: (1) "damages for breach of contract should put the plaintiff in the same economic position he would have been in had the defendant fulfilled the contract," and (2) such damages "are to be measured from the date of the breach." *Lucente v. IBM,* 310 F.3d 243, 262 (2d Cir. 2002). Petitioners admitted this. Tr. at 3953, 3955. It is also well-settled that in cases alleging a breach of contract to deliver stock, *the breach occurs on the date that stock is not delivered.*

In *Hermanowski v. Acton Corp.*, 729 F.2d 921, 922 (2d Cir. 1984), the court found that a breach of a contract to deliver stock options "occurred in November 1979, *when Acton refused to deliver the stock*[.]" (emphasis added.)  Similarly, in *Oscar Gruss Son, Inc. v. Hollander,* 337 F.3d 186, 197 (2d Cir. 2003), a case involving the failure to deliver stock warrants, the court found that the "proper valuation for the warrants was the date of the breach – *the date Hollander failed to deliver the warrants*."[8]  (emphasis added).  Credit Suisse explained this to the arbitrators.  Tr. at 3635, 3957, 4160-63.

Here, Petitioners had no right to receive shares until contractually identified settlement dates in 2016, 2017, 2018, 2019, and 2020, and Petitioners' counsel admitted that, even in a termination without cause, the contract "just plays out as you go through the plan."  Tr. at 3953 (Petitioners' Counsel); Tr. at 3473 (Tocknell); Tr. at 3694-710 (Dubinsky); CS Closing at 164-67.  Since Petitioners had *no contractual right to receive the stock before those dates,* the law required the Panel to calculate damages based on the value of the Credit Suisse stock *on the undisputed,*

---

[8] *Accord Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.,* 618 F. Supp. 2d 280, 293 (S.D.N.Y. 2009) ("While the parties propose creative legal arguments that stretch legal principles beyond their intended purpose, the most obvious date on which Aristocrat breached the Indenture is when Aristocrat *refused to deliver the shares to the Bondholders after the Bondholders completed the necessary steps to convert their bonds*.") (emphasis added).

*contractual settlement dates*.  *Hermanowski,* 729 F.2d at 922; *Oscar Gruss Son*, 337 F.3d at 197.  The uncontroverted evidence established that, on these dates, Firstman's contingent deferred awards were worth $543,467, Horncastle's were worth $299,374, and Cram's were worth $16,755.  RX 1175A at 8-10; 1176A at 8-10; 1177A at 8-10.

Nonetheless, Petitioners asked the Panel to ignore the law and the share price on the contractual settlement dates, and calculate "equitable" damages based on the share price as of October 20, 2015.  Tr.  at 3957-58.  The Panel did so, and awarded $1,010,000.00 to Firstman, $660,000 to Horncastle, and $85,000 to Cram, which reflected Petitioners' request for damages based on the October 20, 2015 stock price.  Award at 3; Damages Statement; CX. 205; Tr. at 3957, 3958, 4012-5.

The Panel thus exceeded its authority because the law required them to calculate damages using the share prices on the settlement dates and forbids recovery on equitable theories where, as here, a written contract controls the subject matter.  *Goldman,* 5 N.Y.3d at 572; *Clark-Fitzpatrick,* 70 N.Y.2d at 388.  The Panel "did not merely misapply principles of contractual interpretation . . . but drew on a concept [of equity] upon which it is not entitled to rely."  *Harry Hoffman Printing Inc.,* 950 F.2d at 98-99.  "The courts have not hesitated to vacate an arbitration award which grants *damages in excess of the maximum allowable under the parties' contract.*"

28

*Mele v. Gen. Acc. Ins. Co.,* 198 A.D.2d 731, 732 (N.Y. App. Div. 3d Dep't. 1993) (emphasis added).  By awarding greater damages than allowable under the law, the Panel exceeded its authority, and the Award should be vacated.

### C.   The Panel Exceeded its Authority By Awarding Interest as of October 20, 2015

There is no basis for the Panel's decision to award interest "according to Ga. Code Ann. §§ 7-4-2 and 13-6-13 law[,] starting on October 20, 2015, until the date of this Award."  The Panel had no authority to award relief under Georgia law and, even if it did, Georgia law, like New York law, is clear that interest on a breach of contract claim is calculated from "the time of the breach."  *See*, *e.g.*, O.C.G.A. § 7-4-15 (pre-judgment interest is calculated from the time compensation becomes payable); O.C.G.A. § 13-6-13 (in contract cases, interest is calculated from "the time of the breach."); *Rodriguez v. Miranda*, 234 Ga. App. 779, 793 (Ga. App. Ct. 1998); *NML Capital v. Rep. of Argentina*, 17 N.Y. 3d 250, 258 (2011).

Under *Hermanowski,* 729 F.2d at 922 and its progeny, no breach occurred until the contractual settlement dates in 2016, 2017, 2018, 2019, and 2020. RX 1175A, at 4; 1176A, at 4; 1177A, at 4.  Thus, the Panel's award of interest from October 20, 2015, must be vacated.

### D.   The Panel Exceeded Its Authority By Awarding Attorney's Fees

"It is well settled in New York that a prevailing party may not recover

attorneys' fees from the losing party except where authorized by statute, agreement or court rule." *Fiduciary Ins. Co. of Am. v. Medical Diagnostic Servs., P.C.*, 150 A.D.3d 498, 498 (1st Dep't 2017) (citations omitted).  Here, both New York law and the EDRP required each side to bear their own attorney's fees. JX 14, at 51 ¶3.

Despite these limitations on the arbitrators' authority, the Panel awarded fees and plainly exceeded its authority.  In *UBS Warburg LLC v. Auerbach, Pollack & Richardson, Inc.*, 294 A.D.2d 245 (N.Y. App. Div., 2002), *lv denied*, 100 N.Y.2d 504 (2003), the court vacated an award of fees because the parties' arbitration agreement, which was governed by New York Law, did not allow the arbitrators to award Auerbach legal fees.  The court found that "such an award was beyond their authority."  *Id.*   Significantly, one of Black's undisclosed article criticized this decision as "anomalous" and "unfortunate."  *The Irony of Securities Arbitration*, 72. U. CIN. L. REV. at 441. It thus clear the Panel ignored the law and dispensed their "own brand of industrial justice."  *Stolt-Nielsen*, 559 U.S. at 671. The Award should, therefore, be vacated.

## *CONCLUSION*

For the reasons set forth above, Credit Suisse Securities (USA) LLC respectfully asks the Court to grant its Motion and vacate the arbitration award.

This 11th day of June, 2020.

Respectfully submitted,

SMITH, GAMBRELL & RUSSELL, LLP

/s/ *Leah Ward Sears*
Leah Ward Sears
Georgia Bar No. 633750
Colin Đăng Delaney
Georgia Bar No. 216858
Greg K. Smith
Georgia Bar No. 658363
Sasha N. Greenberg
Georgia Bar No. 497615

Promenade, Suite 3100
1230 Peachtree Street, NE
Atlanta, Georgia 30309-3592
Telephone: 404-815-3500
Facsimile: 404-815-3509

Email: lsears@sgrlaw.com
Email: cdelaney@sgrlaw.com
Email: gsmith@sgrlaw.com
Email: sgreenberg@sgrlaw.com

*Counsel for Respondent*
*Credit Suisse Securities (USA) LLC*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ANDREW FIRSTMAN,
MARK HORNCASTLE, and
CHRISTIAN CRAM,

                Petitioners,

    -v-

CREDIT SUISSE SECURITIES (USA) LLC,

                Respondent.

**Case No. <u>1:19-cv-04025-CAP</u>**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel for Respondent Credit Suisse Securities (USA) LLC hereby certifies that on this day he caused the foregoing **BRIEF IN OPPOSITION TO PETITION TO CONFIRM AND IN SUPPORT OF APPLICATION BY MOTION TO VACATE ARBITRATION AWARD** to be electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing sufficient to constitute service to the following:

Christina Baugh, Esq.
Adam Gajadharsingh, Esq.
BARNES & THORNBURG LLP
3475 Piedmont Road NE, Suite 1700
Atlanta, Georgia 30305

*Counsel for Petitioners Andrew Firstman, Mark Horncastle, and Christian Cram.*

This 11th day of June, 2020.

/s/ *Leah Ward Sears*
Leah Ward Sears
Georgia Bar No. 633750

Smith, Gambrell & Russell, LLP
Promenade, Suite 3100
1230 Peachtree Street, NE
Atlanta, Georgia 30309-3592
Telephone: 404-815-3500
Facsimile: 404-815-3509
Email: lsears@sgrlaw.com